# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

TIFFANY MORRISSEY O/B/O   :
C.K.M. , a minor          :
                        :
       Plaintiff,     :     No. 3:20-cv-00883
                        :
       v.           :     (SAPORITO, M.J.)
                        :
KILOLO KIJAKAZI, Acting   :
Commissioner of Social Security[1], :
                        :
       Defendant.    :

# MEMORANDUM

The plaintiff, Tiffany Morrissey, as parent and natural guardian of C.K.M., her minor son, brought this action under 42 U.S.C. § 1383(c)(3), and, as incorporated by reference, 42 U.S.C. § 405(g), seeking judicial review of the final decision of the Commissioner of Social Security denying C.K.M.'s claim for supplemental security income benefits under Title XVI of the Social Security Act (the "Act").

---

[1] Kilolo Kijakazi became the Acting Commissioner of Social Security n July 9, 2021. She has been automatically substituted in place of the original defendant, Andrew Saul. See Fed. R. Civ. P. 25(d); see also 42 U.S.C. §405(g) (action survives regardless of any change in the person occupying the office of Commissioner of Social Security). The caption in this case is amended to reflect this change.

This matter has been referred to the undersigned United States Magistrate Judge on consent of the parties, pursuant to the provisions of 28 U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil Procedure. (Doc. 12).

For the reasons stated herein, the Commissioner's decision will be **VACATED**, and the case will be **REMANDED** for further consideration.

## I.    *Background and Procedural History*

On July 25, 2017, Tiffany Morrissey ("Morrissey") protectively filed an application for supplemental security income ("SSI") benefits on behalf of her minor son, C.K.M., alleging an onset of disability as of March 13, 2015. (Tr. 87-92). Morrissey alleged that C.K.M. was disabled due to mood defiant disorder, poor nutrition, adjustment disorder, can't sit still, always moving and flailing his hands around, always yelling when playing, needs to be told repeatedly to do something, throws tantrums. (Tr. 93)  Morrissey's claim was initially denied on October 30, 2017. (Tr. 107-111). Thereafter, Morrissey filed a timely request for an administrative hearing on January 2, 2018, and it was granted. (Tr. 112-114).  Morrissey appeared with C.K.M. and testified before

Administrative Law Judge ("ALJ") Susan L. Torres on February 26, 2019, in Harrisburg, Pennsylvania. She was not represented by counsel at the proceeding. (Tr. 13). At the hearing, Morrissey testified that C.K.M. was being tested for autism which was then suspected. (Tr. 41) At the time of the hearing, C.K.M. was seven years-old and he was in first grade. (Tr. 44).

On May 16, 2019, the ALJ issued an unfavorable decision in which she found that C.K.M. was not entitled to SSI benefits because he was not under a disability as defined by the Act. Specifically, the ALJ found that C.K.M. did not have an impairment or combination of impairments that meets, medically equals, or functionally equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 10-34). Morrissey sought further review of C.K.M's claims by the Appeals Council of the Office of Disability Adjudication and Review, but her request was denied for review on April 3, 2020. (Tr. 1-5). Morrissey subsequently filed an appeal to this Court on June 1, 2020. (Doc. 1) Attached to Morrissey's appeal were medical records indicating that C.K.M. was diagnosed with autism and receiving in home therapeutic support staff ("TSS") services for 8 hours per week. (*Id.*) Because

Morrissey filed her appeal *pro se*, we liberally construe her appeal to argue that the ALJ's decision was not supported by substantial evidence. On November 9, 2020, the Commissioner filed his answer, in which he maintains that the ALJ's decision was correct and in accordance with the law and regulations. (Doc. 17, at 2). This matter has been fully briefed by the parties and is ripe for decision. (Doc. 21; Doc. 22).

C.K.M. was a seven-year old minor at the time of the ALJ's decision in this matter. Under Social Security regulations, C.K.M. is considered a school-age child. *See* 20 C.F.R. § 416.9265a(g)(2)(iv). He was first diagnosed with Oppositional Defiant Disorder in 2016. He was suspected to suffer from Autism in 2018 and he was diagnosed with Autism in 2019.

Because the issues on appeal deal primarily with C.K.M.'s mental health, we will address only that evidence which is relevant to those issues. The longitudinal record indicates that C.K.M.'s level of function declined over time, with an ultimate diagnosis of Autism being rendered at the time of the hearing. C.K.M. was a preschooler at the time of Morrissey's application on July 10, 2017, and thereafter he became a school age child. He is currently a school aged child. (Tr. 16)

In April of 2016, C.K.M. was seen by his family physicians, Family Medical Twin Rose ("Twin Rose"). (Tr. 237) It was noted that he had emotional reactivity at home with anger outbursts. (*Id.*) Additionally, he was showing perseverative arm and hand movements, and he was hitting, biting, and kicking others. (*Id.*) Morrissey reported that C.K.M. was biting his fingernails and picking at his skin until it would bleed. (Tr. 238) In May of 2016, Morrissey presented with C.K.M. again to Twin Rose. (Tr. 235-236) The chief complaint was behavioral issues and it was reported that C.K.M. would behave for his father and grandmother but not for his mother. (Tr. 235) It was reported that he was four years old and refused to be potty trained and that he would play well with kids on some days, but on other days he would hit them and steal toys. (*Id.*) A referral was made to T.W. Ponessa and Assoc. Counseling Services ("TW Ponessa") and C.K.M. received services from May 2016 through August 29, 2016. (Tr. 214) At the time that C.K.M. presented, Morrissey was complaining of anger, non-compliance and aggression. (*Id.*) In October of 2016, C.K.M. was discharged due to non-compliance. (*Id.*) At the time of discharge it was noted that C.K.M. had been diagnosed with oppositional defiant disorder and he was expected to follow-up with Dr.

Reis for medication management. (*Id.*) In October of 2016, C.K.M. was seen at Twin Rose for a cough. (Tr. 227.) It was noted that C.K.M. had behavioral issues and was taking melatonin. (*Id.*)

In August of 2017, C.K.M. was again seen by TW Ponessa and was noted to have a diagnosis of Oppositional Defiant Disorder and a rule out diagnosis of disruptive mood regulation disorder. (Tr. 215) It was noted that C.K.M. had demonstrated aggression, cruelty to animals, poor relationships with peers, noncompliance with requests, temper tantrums, defiance, and opposition. (*Id.*) He would hit, bite, and throw things. (*Id.*) It was noted that he was receiving wraparound behavioral health services and he was admitted to a partial program. (*Id.*)

In August of 2017, C.K.M. was also examined by Kathleen Lederman, PsyD, ("Dr. Lederman") at the request of the Commissioner. (Tr. 295-303) Dr. Lederman noted that C.K.M. had behavioral health services while at school but he was in regular education. (Tr. 295) She noted that C.K.M. had been in outpatient therapy but for the past 2 weeks, he had been enrolled in an acute partial day program in a hospital from 6:30 a.m. through 4:30 p.m. (10 hours) per day. (*Id.*) It was noted that following his discharge from the day treatment program

a behavioral health services worker would be providing services both at home and at school for C.K.M. (Tr. 296)  On examination, it was noted that C.K.M. was not wearing his glasses, and it was reported by his mother to hide or break them.  (Tr. 297-98)  Dr. Lederman thought that C.K.M.'s speech, thought process, affect, and mood were appropriate. (Tr. 98)  Dr. Lederman noted that C.K.M. did not know what day it was; that he had difficulty with attention and concentration, and that his memory appeared to be impaired.  (*Id.*)  Dr. Lederman opined that C.K.M. had average cognitive functioning with age appropriate insight and judgment.  (Tr. 298-99)  Dr. Lederman diagnosed C.K.M. with attention deficit hyperactivity, combined type; unspecified depressive disorder; unspecified anxiety disorder; enuresis; encopresis; oppositional defiant disorder; and intermittent explosive disorder.  (Tr.  299)

Immediately following the application, C.K.M. was enrolled in kindergarten at Park Elementary School.  (Tr. 166)  In October of 2017, C.K.M.'s kindergarten teacher, Michelle Winters, completed a teacher questionnaire in which she indicated that C.K.M. was taking Ritalin twice and day and showing at that time mild to moderate problems.  (Tr. 166-73)  She advised that C.K.M. had only slight problems in acquiring

and using information; only a slight problem in carrying out multi-step tasks; slight and obvious (moderate) problems in some areas of interacting with others; only slight problems in moving about and manipulating objects and only slight problems in caring for himself. (Tr. 168-71)

On April 6, 2018, C.K.M.'s psychiatrist, Dr. Reis, referred him for a partial hospitalization program at TW Podessa. (Tr. 313). It was noted that at that time C.K.M. was receiving 14 hours a month of behavioral support services. (*Id.*) The referral was as a result of "significant clinical concerns related to non-compliance, opposition and defiance, physical and verbal aggression and poor coping skills." (Tr. 310). It was noted that C.K.M. was physically and verbally aggressive on a daily basis. He was an elopement risk, "hyperactive, impulsive and fidgety." (Tr. 310) It was reported that in February 2018, C.K.M. had wrapped a scarf around his neck at school and held it tight until his face turned red and he reportedly heard voices. (Tr. 311). C.K.M. reportedly released the scarf after his teacher ordered him to stop. (*Id.*) It was assessed that C.K.M. had mild to moderate severity of symptoms of shyness; he had moderate severity of non-compliance and physical aggression; and he

had moderate to severe symptoms of hyperactivity and impulsiveness, verbal aggression, and unsafe behaviors. (Tr. 314-317) C.K.M.'s behavioral health worker indicated that on a daily basis he had problems with physical aggression, verbal aggression, tantrums, refusing to engage in tasks, inability to move from one activity to another, arguing when given a task, deliberately annoying others, and crying or getting upset. (Tr. 320-22).

On November 18, 2019, C.K.M. was seen at Philhaven Center for Autism and Developmental Disabilities ("Philhaven") after referral by his treatment team at TW Podessa after completing a partial hospitalization plan. (Tr. 376) An evaluation was performed and it was opined that "with the exception of SRS scores, all other elements of this multidisciplinary report are very consistent and clearly support impairments in social functioning, communication, and restricted interests that would meet the full criteria for an autism spectrum disorder." (Tr. 377). Thus, C.K.M. was formally diagnosed with an autism spectrum disorder, level 1; an attention deficit hyperactivity disorder, combined type and an insomnia disorder. (Tr. 378). It was the opinion of Michael Fueyo, MD, that C.K.M. needed to receive continued

supportive services through TW Podessa and have an IEP plan for his school which addressed his issues.  (*Id.*)

Park Street Elementary records indicate that academically C.K.M. was achieving grades at an A or B level during the 2019 school year with his support services in place.  (Tr. 199-200)   A questionnaire completed in March of 2019 by C.K.M.'s first grade teacher, Danielle Eshelman, indicated a sharp decline in C.K.M.'s functioning in the last year however, when compared to the earlier evaluation of Ms. Winters.  (Tr. 204-11)  Ms. Eshelman found that C.K.M. had no problems with regard to the domain of acquiring and using information or in the domain of attending and completing tasks.   (Tr. 205-06)   In the domain of interacting with others Ms. Eshelman noted that C.K.M. had serious difficulty on a daily basis playing with other children, and making friends. (Tr. 207) She advised that C.K.M. had an obvious problem with seeking attention appropriately, with introducing and maintaining relevant and appropriate topics of conversation, and with interpreting the meaning of facial expressions, body language, hints or sarcasm.  (*Id*.) She noted that C.K.M. was rarely a behavior problem but needed redirection and time-outs and had been suspended for violent behavior.

(*Id.*) Ms. Eshelman stated that C.K.M. "does fine academically" but "has had great difficulty" in socializing. (*Id.*) With regard to the domain of moving about and manipulating objects, Ms. Eshelman opined that C.K.M. had slight problems, stating that he had difficulty with fine motor skills and writing, would move slowly and or oddly at times and would at times get lost in his own thoughts. (Tr. 208) In the domain of caring for himself, Ms. Eshelman opined that C.K.M. had serious problems in maintaining personal hygiene and had an obvious problem in identifying and asserting emotional needs as well as responding appropriately to changes in his own mood. (Tr. 209) Ms. Eshelman advised that C.K.M. had slight problems in handling frustration, being patient, using good judgement regarding safety, using appropriate coping skills and knowing when to ask for help. (*Id.*) She wrote that C.K.M. had issues with hygiene and with picking at his nose, face and fingers; that he could be moody at times; that he had "lots of difficulty" with social interactions and that he would "pretend" things which would make him and those around him distracted and off task. (*Id.*)

The ALJ addressed the medical opinion evidence in the file, as well as the opinions of teachers, Ms. Winter and Ms. Eshelman.

The ALJ found Ms. Eshelman's opinions to be persuasive, although she focused her review to Ms. Eshelman's findings that C.K.M. did not engage in violent behaviors when he was taking his medication to be consistent with the record and failed to discuss the balance of Ms. Eshelman's findings. (Tr. 21-22) The ALJ found the opinions of Michelle Winters to be partially persuasive, finding that Ms. Winters rendered her opinions before C.K.M. experienced improvement in his symptoms with medical management and psychotherapy. (Tr. 22-23)

The ALJ considered the opinions of Dr. Lederman and found them to be partially persuasive, noting that the record supports more restrictive findings as it relates to C.K.M.'s limitations in the domains of moving about and manipulating objects, of interacting with others, and of health and physical well-being. (Tr. 22)

Similarly, the ALJ found that the opinions of state agency consultants John Cavazzi, PsyD and Carl Ritner, DO were partially persuasive, as she found that the record indicated more restrictive findings, particularly with regard to C.K.M.'s ability to interact with others while his struggles continued despite improvements in his condition. (Tr. 22)

## II.  Legal Standards

When reviewing the denial of disability benefits, the Court's review is limited to determining whether those findings are supported by substantial evidence in the administrative record. *See* 42 U.S.C. § 405(g) (sentence five); *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 200 (3d Cir. 2008); *Ficca v. Astrue*, 901 F. Supp. 2d 533, 536 (M.D. Pa. 2012). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (internal quotation marks omitted). Substantial evidence is less than a preponderance of the evidence but more than a mere scintilla. *Richardson v. Perales*, 402 U.S. 389, 401 (1971). A single piece of evidence is not substantial evidence if the ALJ ignores countervailing evidence or fails to resolve a conflict created by the evidence. *Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir. 1993). But in an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's decision] from being supported by substantial evidence."

*Consolo v. Fed. Maritime Comm'n*, 383 U.S. 607, 620 (1966). "In determining if the Commissioner's decision is supported by substantial evidence the court must scrutinize the record as a whole." *Leslie v. Barnhart*, 304 F. Supp. 2d 623, 627 (M.D. Pa. 2003). The question before this Court, therefore, is not whether K.N. is disabled, but whether the Commissioner's finding that he is not disabled is supported by substantial evidence and was reached based upon a correct application of relevant law. *See Arnold v. Colvin*, No. 3:12-CV-02417, 2014 WL 940205, at *1 (M.D. Pa. Mar. 11, 2014) ("[I]t has been held that an ALJ's errors of law denote a lack of substantial evidence.") (alterations omitted); *Burton v. Schweiker*, 512 F. Supp. 913, 914 (W.D. Pa. 1981) ("The Secretary's determination as to the status of a claim requires the correct application of the law to the facts."); *see also Wright v. Sullivan*, 900 F.2d 675, 678 (3d Cir. 1990) (noting that the scope of review on legal matters is plenary); *Ficca*, 901 F. Supp. 2d at 536 ("[T]he court has plenary review of all legal issues . . . .").

With respect to children under the age of 18, the Social Security regulations consider an individual to be "disabled" if he or she has "a

medically determinable physical or mental impairment[2] or combination of impairments that causes marked and severe functional limitation, and that can be expected to cause death or that has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.906; *see also* 42 U.S.C. § 1382c(a)(3)(C)(i). A child has "marked and severe functional limitations" if he or she has an impairment or combination of impairments that "meets, medically equals, or functionally equals" the listings found at 20 C.F.R., Part 404, Subpart P, Appendix 1. *Id.* § 416.902; *see also id.* § 416.911(b). However, "no individual under the age of 18 who engages in substantial gainful activity[3] . . . may be considered to be disabled." 42 U.S.C. § 1382c(a)(3)(C)(ii); *see also* 20 C.F.R. § 416.906.

The Commissioner follows a three-step sequential analysis to ascertain whether a child is disabled and therefore eligible to receive SSI benefits. *See* 20 C.F.R. § 416.924(a). Under this process, the ALJ must

---

[2] "[A] physical or mental impairment is an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 1382c(a)(3)(D); *see also* 20 C.F.R. § 416.908.

[3] "Substantial gainful activity means work that . . . [i]nvolves doing significant and productive physical or mental duties; and . . . [i]s done (or intended) for pay or profit." 20 C.F.R. § 416.910.

determine in sequence: (1) whether the child is engaged in substantial gainful activity (*i.e.*, whether the child is working), *id.* § 416.924(b); (2) whether the child has a medically determinable impairment or combination of impairments that is severe (*i.e.*, whether the child has an impairment or combination of impairments that cause "more than minimal functional limitations"), *id.* § 416.924(c); and (3) whether the impairment or combination of impairments meets or medically equals the severity of a listing, or functionally equals the listings, in 20 C.F.R., Part 404, Subpart P, Appendix 1, which describes impairments that cause marked and severe functional limitations, *id.* § 416.924(d).

Within each of the individual listings considered at step three, the regulations specify the objective medical and other findings needed to satisfy the criteria of that listing. An impairment or combination of impairments *meets* a listing when it satisfies all of the criteria of that specified listing, and it meets the duration requirement (*i.e.*, it is expected to cause death or has lasted or is expected to last for a continuous period of not less than 12 months). *Id.* § 416.925(c)(3); *see also id.* § 416.909 (duration requirement). An impairment or combination of impairments *medically equals* a listing when it is at least

equal in severity and duration to the criteria of any listed impairment (*e.g.*, the child exhibits all but one of the findings specified in a particular listing, but other related findings are at least of equal medical significance to the required criteria). *Id.* § 416.926(a),(b). An impairment or combination of impairments *functionally equals* the listings when it "result[s] in 'marked' limitations in two domains of functioning or an 'extreme' limitation in one domain." *Id.* § 416.926a(a).

In assessing functional equivalence, the Commissioner considers how the child functions in terms of six "domains" or broad areas of functioning intended to capture all that a child can or cannot do: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with other children; (4) moving about and manipulating objects; (5) caring for yourself; and (6) health and physical well-being. *Id.* § 416.926a(b)(1). A child has a "marked limitation" in a domain when his impairment or combination of impairments interferes seriously with his ability to independently initiate, sustain, or complete activities; a "marked limitation" is more than moderate but less than extreme. *Id.* § 416.926a(e)(2). A child has an "extreme limitation" interferes very seriously with his ability to independently initiate,

sustain, or complete activities; an "extreme limitation" is more than marked. *Id.* § 416.926a(e)(3). "Extreme limitation" is the rating given to the worst limitations, but it does not necessarily mean a total lack or loss of ability to function. *Id.*

The ALJ's disability determination must also meet certain basic substantive requirements. Most significantly, the ALJ must provide "a clear and satisfactory explication of the basis on which" his or her decision rests. *Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981). "The ALJ must indicate in his decision which evidence he has rejected and which he is relying on as the basis for his finding." *Schaudeck v. Comm'r of Soc. Sec. Admin.*, 181 F. 3d 429, 433 (3d Cir. 1999). The "ALJ may not reject pertinent or probative evidence without explanation." *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 204 (3d Cir. 2008). Otherwise, " 'the reviewing court cannot tell if significant probative evidence was not credited or simply ignored.' " *Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 121 (3d Cir. 2000) (quoting *Cotter*, 642 F.2d at 705). *Milevoi o/b/o M.E.M. v. Saul*, No. 1:18-CV-02220, 2019 WL 6999715, at *3 (M.D. Pa. Dec. 4, 2019), report and recommendation adopted, No. 1:18-CV-02220, 2019 WL 6910687 (M.D. Pa. Dec. 19, 2019).

## III. The ALJ's Decision

In this case, the ALJ reached the third step of the sequence, at which point she determined that C.K.M. was not disabled. The ALJ first determined that C.K.M. had not engaged in substantial gainful activity since July 10, 2017, the date when his application for SSI benefits was filed. (Tr. 16). The ALJ next found that the medical evidence of record established that C.K.M. had severe impairments of attention deficit hyperactivity disorder, depressive disorder, anxiety disorder, oppositional defiant disorder, intermittent explosive disorder, autism spectrum disorder, asthma, enuresis, and encopresis. (*Id.*).

At step three, the ALJ evaluated C.K.M.'s impairments under listings 103.30 pertaining to asthma; under 112.04 pertaining to depressive disorder; under 112.04 pertaining to anxiety disorder; under 112.08 pertaining to oppositional defiant disorder and intermittent explosive disorder; under 112.10 pertaining to autism spectrum disorder; and under 112.11 pertaining to attention deficit hyperactivity disorder. (Tr. 17) The ALJ made a general finding that C.K.M.'s impairments did not meet or medically equal those listings. (*Id.*).

The ALJ then considered whether C.K.M.'s impairments, both

severe and non-severe, functionally equaled the listings. In doing so, the ALJ followed the "whole child" approach set forth in Social Security Ruling 09-1p, which provides:

> The functional equivalence rules require us to begin by considering how the child functions every day and in all settings compared to other children the same age who do not have impairments. After we determine how the child functions in all settings, we use the domains to create a picture of how, and the extent to which, the child is limited by identifying the abilities that are used to do each activity, and assigning each activity to any and all of the domains involved in doing it. We then determine whether the child's medically determinable impairment(s) accounts for the limitations we have identified. Finally, we rate the overall severity of limitation in each domain to determine whether the child is "disabled" as defined in the Act.

Soc. Sec. Ruling 09-1p, 2009 WL 396031, at *2.

The ALJ considered the evidence of record and presented detailed findings with respect to C.K.M's limitations and their severity, domain by domain. (Tr. 23-30). Ultimately, the ALJ concluded that C.K.M. had: (a) no limitation in acquiring and using information; (b) less than marked limitation in attending and completing tasks; (c) a marked limitation in interacting and relating with others; (d) less than marked limitation in moving about and manipulating objects; (e) less than marked limitation in the ability to care for himself; and (f) less than

a marked limitation in health and physical well-being. (*Id.*)

Having found that C.K.M. did not have an impairment or combination of impairments that resulted in "marked" limitations in two domains of functioning or an "extreme" limitation in one domain, the ALJ concluded that C.K.M.'s impairments did not functionally equal the listings at 20 C.F.R., Part 404, Subpart P, Appendix 1, and therefore he was not disabled and not entitled to receive SSI benefits. (Tr. 30).

## IV. Analysis

Morrissey filed her appeal *pro se.* In her brief, Morrissey sets forth several reasons why she believes that the ALJ erred. She states first that C.K.M. has behavioral issues, including autism; secondly, that he takes four different medications during the day at multiple times; thirdly, that C.K.M. has many support specialists who see him both at home and at school and he recently attended day hospitalization on two occasions; lastly, she recites a number of maladaptive and self-injurious behaviors in which C.K.M. regularly engages.

We liberally construe her argument to indicate that the ALJ's decision was not supported by substantial evidence.

### a. The ALJ did not properly consider the support services necessary to allow C.K.M. to function

*on a daily basis when determining whether C.K.M. had an extreme limitation in the domain of Interacting and Relating with Others*

We agree with Morrissey particularly as to the third issue which she has raised regarding the substantial degree of supportive services which have been provided to C.K.M., both at school and in the home in order to allow him to maintain a level of functioning. Because we find that the ALJ erred in properly considering the evidence with regard to the structured environment which C.K.M. required in order to function, we cannot find that the ALJ's finding that C.K.M. had a less than marked limitation in the domain of caring for himself or a less than extreme limitation in the domain of interacting with others was supported by substantial evidence.

In the domain of interacting and relating with others, the Commissioner is to "consider how well [claimants] initiate and sustain emotional connections with others, develop and use the language of [claimants'] community, cooperate with others, comply with rules, respond to criticism, and respect and take care of the possessions of others. Examples of limited functioning in this domain include: having no close friends of an appropriate age; avoiding or withdrawing from

people that the claimant is familiar with; becoming overly anxious or fearful of meeting new people or trying new things; difficulty playing games or sports with rules; difficulty communicating with others; and difficulty speaking intelligibly or with adequate fluency. *L.B. o/b/o S.B. v. Comm'r of Soc. Sec.*, Civil Action No. 19-885, 2020, WL 603991 *9 (D. NJ. Feb. 5, 2020); 20 C.F.R. § 416.926a(i)(3).

The ALJ set forth the general standards which apply regarding the domain of interacting and relating with others both with regard to the standard for a preschooler and for a school age child, as C.K.M. was a preschooler at the time of application but subsequently reached the latter category. (Tr. 26). With regard to the standards which apply to a school age child, which C.K.M. was at the time of the hearing, the ALJ noted that the child should be developing more lasting friendships with other children of the same age, should be beginning to understand how to work in groups to solve problems, should be able to play with other children from diverse backgrounds and attach to adults other than parents, and should be able to initiate and participate in conversations. (*Id.*)

The ALJ went on to find that C.K.M. had a marked limitation in

this area. (Tr. 27). In her reasoning, the ALJ noted that C.K.M. had an extensive history of having tantrums and being highly oppositional; and he exhibited behaviors such as refusing to get dressed, refusing to eat, kicking, spitting, hitting, and engaging in elopement tactics. (Tr. 27). The ALJ referenced the treatment notes of TW Podessa, which, indicate that those symptoms improved with "medication." (Tr. 27). Similarly, the ALJ noted that C.K.M.'s teacher indicated that he still had serious problems playing with other children, and making friends, as well as obvious problems in appropriately seeking attention, introducing relevant topics, asserting his own emotional needs, interpreting the facial expressions and body language of others, and responding to changes in mood. (*Id*.).

The ALJ erred in making a simple finding that the records from TW Podessa indicated that C.K.M.'s symptoms improved with "medication." To the contrary, the medical records of TW Podessa indicate that medication and out-patient therapy had failed to alleviate C.K.M.'s symptoms. It was only after C.K.M. was enrolled in an intensive partial hospitalization program consisting of 10 hours of treatment daily for 5 days per week that the symptoms were alleviated.

Moreover, C.K.M.'s supportive services were extended to "wraparound" services, where he was provided with supportive services for 2 hours per day, 3 days per week both at home and during school.

> Because a structured setting often masks the symptoms of a disability and improves the child's ability to function within that supportive environment, the ALJ is instructed to consider the degree of limitation in functioning the child has or would have outside the structured setting. 20 C.F.R. § 416.924a(b)(5)(iv)(C). That is, an ALJ cannot appropriately evaluate the effects of [plaintiff's] structured setting on his ability to function without identifying the nature of his structured setting and the amount of help he receives from it.

*Gonzalez v. Astrue*, No. 1:07–cv–00487, 2009 WL 4724716, at *6–7 (N.D.N.Y.2009). *A.B. on Behalf of Y.F. v. Colvin*, 166 F. Supp. 3d 512, 520 (D.N.J. 2016.

Here, we cannot find that the ALJ properly considered the amount of support which C.K.M. received on a daily basis. In no way did the ALJ's cursory finding that C.K.M. responded to "medication" address those support services. In order to achieve improvement, C.K.M. required placement in an institutional setting and in order to sustain that improvement, he required a structured environment in which he received supportive services in both the home and school settings. This was not addressed by the ALJ.

Such accommodations must be considered. *See* 20 C.F.R. § 416.924a(b)(5)(iv)(E) ("[I]f your symptoms or signs are controlled or reduced in a structured setting, we will consider how well you are functioning in the setting and the nature of the setting in which you are functioning (e.g., home or a special class); the amount of help you need from your parents, teachers, or others to function as well as you do; adjustments you make to structure your environment; and how you would function without the structured or supportive setting.").

*Milevoi o/b/o M.E.M. v. Saul*, No. 1:18-CV-02220, 2019 WL 6999715, at *5 (M.D. Pa. Dec. 4, 2019), *report and recommendation adopted*, No. 1:18-CV-02220, 2019 WL 6910687 (M.D. Pa. Dec. 19, 2019).

The record indicates that C.K.M. required placement in an intensive partial hospitalization setting on two occasions within the span of less than 3 years. Barring a full institutional placement, there is no greater restrictive environment in which C.K.M. could be placed than the programs in which he was placed. Ten hours of treatment per day, five days per week is an extreme measure. The fact that it was mentioned only in a cursory manner in passing is troubling.

The ALJ failed to explain how the fact that C.K.M. continued to struggle with interactions with others, despite the fact that there were supportive services in place, would indicate a higher level of limitation. Rather, the ALJ simply discussed the fact that C.K.M. had been

prescribed "medication."

> While the ALJ is not required "to use particular language or adhere to a particular format in conducting his analysis," *Jones v. Barnhart*, 364 F.3d 501, 505 (3d Cir. 2004), the ALJ must discuss the evidence and explain his reasoning sufficiently "to enable meaningful judicial review."

*Diaz v. Comm'r of Soc. Sec.*, 577 F.3d 500, 504 (3d Cir. 2009). *Milevoi o/b/o M.E.M. v. Saul*, No. 1:18-CV-02220, 2019 WL 6999715, at *6 (M.D. Pa. Dec. 4, 2019), *report and recommendation adopted,* No. 1:18-CV-02220, 2019 WL 6910687 (M.D. Pa. Dec. 19, 2019).

Here, because the ALJ found that there was a marked limitation in this domain only, without addressing these factors, we cannot say that she properly evaluated whether C.K.M.'s limitations rose to a level of "extreme." Accordingly, we cannot find that substantial evidence supports the ALJ's determination.

### b. The ALJ's finding that C.K.M. has a less than marked limitation in caring for himself is not supported by substantial evidence.

In her fourth allegation of error, Morrissey alleged that the ALJ failed to consider a number of maladaptive and self-injurious behaviors, including the fact that he would break his own toys, unstrap himself

from his car seat, and hit or kick the car windows. (Doc. 21 at 1-2). She additionally alleged that the ALJ failed to consider the fact that C.K.M. would soil himself when out in public and not tell anyone. (Doc 21 at 2)

The actions enumerated by Morrissey would fall with the domain of "Caring for Yourself." We will construe her allegation to be that the ALJ did not properly consider whether C.K.M. had a marked limitation in the domain of caring for yourself.

SSR 09-05, defines and discusses the domain of "interacting and relating with others." This ruling specifically discusses the difference between the domain of "interacting and relating with others" and "caring for yourself," and states:

> The domain of "interacting and relating with others" involves a child's feelings and behavior in relation to other people (as when the child is playing with other children, helping a grandparent or listening carefully to a teacher). The domain of "caring for yourself" involves a child's feelings and behavior in relation to self (as when controlling stress in age-appropriate manner).

The SSR provides two examples of how a child may have an impairment which causes a limitation in both domains. One of those examples is that of a boy with oppositional defiant disorder who refuses to obey a parent's instruction not to run on a slippery surface. The child's

behavior towards the parent is disrespectful and pertains to the domain of "interacting and relating to others" while his running endangers him and pertains to a limitation in the domain of "caring for yourself." SSR 09-05p specifically states that rating the limitation in each and every domain is not double weighting. (*Id.*)

In discussing the domain of "interacting and relating with others," the ALJ noted that "the claimant has an extensive history of having tantrums and being highly oppositional, outright refusing directives from others. Behaviors included refusing to get dressed, refusing to eat for days if he does not get the food he wants, yelling, biting, spitting, kicking, and engaging in elopement tactics." (Tr. 27)

While the ALJ found that there was a marked impairment in the domain of "interacting and relating with others" she found a less than marked impairment in the domain of "caring for yourself". We find this inconsistent and note that while the ALJ referenced the fact that C.K.M. would refuse to eat for days and outright refused directives with regard to the former domain, she made no reference of those facts when discussing the latter. It is certainly a relevant fact that C.K.M. would refuse food for "days" when considering his ability to care for himself.

When evaluating the "caring for yourself" domain, the regulations provide that the ALJ must consider how well claimants "maintain a healthy emotional and physical state, including how well [claimants] get [their] physical and emotional wants and needs met in appropriate ways; how [claimants] cope with stress and changes in [their] environment; and whether [claimants] take care of [their] own health, possessions, and living area." 20 C.F.R. § 416.926a(k). Examples of limitations in this domain include: continually placing inedible objects in one's mouth; having restrictive or stereotyped mannerisms (e.g. body rocking, headbanging); failing to dress or bathe appropriately because of impairments affecting this domain; engaging in self-injurious behavior or ignoring safety rules; failing to spontaneously pursue enjoyable activities or interests; and having disturbance in eating or sleeping patterns. 20 C.F.R. § 416.926a(k)(3)

The ALJ addressed this domain and found that "claimant has less than marked limitation in the ability to care for himself." (Tr. 29)  In doing so the ALJ first acknowledged Morrissey's testimony, as well as medical evidence noting limitations in this area.  (*Id*.) She noted:

> The claimant's mother asserts that the claimant's ability to take care of his personal needs are limited as he cannot dress

without help, wash, bathe or brush his teeth without help, or put his toys away. At the time of hearing, she further asserted that he cannot wash himself up or rinse himself off, put toothpaste on his toothbrush or tie his shoes. In addition, treatment notes indicate that the claimant has a poor awareness of safety and dangerous situations, which include running off in parking lots or trying to exit a car when it is in motion. However, treatment notes indicate his behaviors improved with the use of medications (4F).

*Id.*

The ALJ further justified her finding that there was a less than marked impairment, noting:

In addition, his education provider indicated that he had only slight problems in handling frustration appropriately, being patient when necessary, using good judgment regarding personal safety and dangerous circumstances, using appropriate coping skills and knowing when to ask for help (Exhibit 12E). Therefore, the undersigned finds that the claimant has a less than marked limitation in the ability to care for himself.

*Id.*

We find that the ALJ has erred in her reasoning in two separate regards. The first error mirrors that noted above. While the ALJ again references that the records of TW Podessa regarding C.M.K.'s partial hospitalization program which are located at 4F indicates improvement, she once again boils down the fact that C.K.M. received 10 hours of treatment per day with additional supportive services outside that

setting to the fact that he improved with "medication". Again, C.K.M. had some improvement in those behaviors, but it was noted to be in an environment in which he had a significant number of structured supportive services. There is no indication from the ALJ's decision that she properly considered those services in determining whether C.K.M. had marked limitations in this domain.

Additionally, we find error in the ALJ's citation to the questionnaire completed by C.K.M.'s teacher, Ms. Eshelman at 12E in the record. We note that the ALJ cited only that portion of Ms. Eshelman's opinion which supports her finding that there is a less than marked limitation in the domain of caring for yourself.

The ALJ referenced Ms. Eshelman's opinion that C.K.M. had slight problems in handling frustration, being patient, using good judgment regarding safety, using appropriate coping skills and knowing when to ask for help in support of her finding. (Tr. 29, citing to 209). But in doing so, the ALJ disregarded the opinion of Ms. Eshelman with regard to this domain. C.K.M. had serious problems in maintaining personal hygiene, and he had an obvious problem in identifying and asserting emotional needs as well as responding appropriately to changes in his

own mood. (Tr. 209) We note, as discussed above, that the ALJ referenced those serious limitations in her finding that C.K.M. had a marked limitation in the domain of "interacting and relating with others." (Tr. 27) The ALJ does not reconcile why those symptoms and limitations were found marked in one domain and less than marked in another, despite an obligation to do so.

Additionally, the ALJ disregarded Ms. Eshelman's handwritten note that C.K.M. had issues with hygiene and with picking at his nose, face, and fingers; that he could be moody at times; that he had "lots of difficulty" with social interactions and that he would "pretend" things which would make him and those around him distracted and off task. (Tr. 209) Consistent with SSR 09-05p, the fact that C.K.M. engaged in behaviors that distracted both himself and others, was behavior which should have been considered in both domains.

We find that the ALJ has erred in failing to include in her reasoning any explanation as to her consideration of Ms. Eshelman's opinions as a whole, and in only explaining her reliance on a portion of those categories in which she opined slight limitations, and disregarding those portions which she found earlier in her opinion to have constituted

a marked impairment.

> The ALJ has a duty to hear and evaluate all relevant evidence in order to determine whether an applicant is entitled to disability benefits." *Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981). *See also* 20 C.F.R. § 416.924a(a) ("We consider all relevant information (i.e., evidence) in your case record" in determining disability for children.). The ALJ's duty to adequately explain the weight given to the opinions of treating physicians also extends to opinions from 'other sources,' especially where those sources may have greater knowledge than a physician about the plaintiff's functioning over time. *See Ruth v. Astrue*, No. 09–2074, 2011 WL 2135672, at 13 (E.D. Pa. May 31, 2011) (finding the ALJ erred in crediting the opinion of a treating physician without adequately discussing a questionnaire provided by a teacher who had known the plaintiff for four years).

*Arce o/b/o L.A. v. Saul*, No. CV 19-5017, 2020 WL 2793132, at *10

(E.D. Pa. May 29, 2020)

Here, we find that the ALJ adequately discussed those portions of Ms. Eshelman's opinions which set forth mild limitations, but disregarded entirely those portions of Ms. Eshelman's opinions which set forth more serious limitations. Given that the ALJ reasoned specifically that it was Ms. Eshelman's opinions which supported her finding of a less than marked limitation in this domain, the act of cherry-picking only those limitations which were milder was inappropriate.

Thus, we cannot find that the ALJ's finding that C.K.M. had a less

than marked limitation in the domain of "caring for yourself" was supported by substantial evidence.

Accordingly, for the reasons stated above, the Court finds that the ALJ's decision is not supported by substantial evidence. Thus, the decision of the Commissioner of Social Security will be **VACATED** and this case will be **REMANDED** for further proceedings consistent with this Memorandum.

An appropriate Order follows.

Dated: July 15, 2021
*s/Joseph F. Saporito, Jr.*
JOSEPH F. SAPORITO, JR.
United States Magistrate Judge